**Navajo Nation, Plaintiff,**
v.
**Peter MacDonald Sr., Defendant,**
**and concerning**
**F.D. Moeller, Val R. Jolley,**
**Randall S. Roberts and William J. Cooley,**
**Petitioners,**
v.
**The Honorable Robert Yazzie,**
**District Judge of the Window Rock District Court,**
**Respondent.**
**Decided September 26, 1990**

## OPINION

Before TSO, Chief Justice, AUSTIN and CADMAN (sitting by designation), Associate Justices.

Val R. Jolley, Esq., Farmington, New Mexico, F.D. Moeller, Esq., Farmington, New Mexico, Randall S. Roberts, Esq., Farmington, New Mexico, and William J. Cooley, Esq., Albuquerque, New Mexico, *Pro se*, Petitioners; and David S. Abeyta Sr., Esq., Navajo Nation Department of Justice, for the Navajo Nation.

Opinion delivered by TSO, Chief Justice.

This is an original action for a writ of prohibition. Four attorneys represent defendant Peter MacDonald Sr. in criminal charges pending in the Window Rock District Court of the Navajo Nation. They are Val R. Jolley and Randall Roberts (of the law firm of Roberts & Jolley), F.D. Moeller, and William J. Cooley ("petitioners"). They all complain of a district court order entered on September 12, 1990 which denied their motion to withdraw as counsel for MacDonald and took under consideration an alternative motion for compensation. The petition for a writ of prohibition was filed on September 14, 1990.

This Court previously denied an appeal upon this question and on September 21, 1990 the matter was remanded to the district court for the preparation of findings by the trial judge and the preparation and filing of a record. Now that the findings of the district court and an adequate record are before this Court, the matter is ripe for adjudication.

# THE RECORD

The district court made detailed findings of fact and entered its conclusions of law. The facts here are taken from the court's findings of fact.

This case began on October 11, 1989 when the Navajo Nation filed various criminal charges against defendant MacDonald. They are classified as the "Big Boqillas Case," the "Election Code Case," and the "Bribes-Kickbacks Case." The district court issued a criminal summons on October 12, 1989. It was served upon MacDonald on October 15, 1989. MacDonald made an initial appearance before the court on November 17, 1989. At that time he claimed indigence and requested the appointment of counsel. Upon a review of MacDonald's information, including his financial statement and the affidavit of an investigator for the Office of the Special Prosecutor, the trial court found that MacDonald had personal property, securities, and a life insurance policy with an aggregate value of over $200,000.00. In addition, the court found that MacDonald had a salary of $55,000.00 per year. Based upon these assets and income the court found MacDonald was not indigent and not entitled to appointed counsel. The court left the door open for MacDonald to submit further information and ask for a reconsideration of the appointment question. On November 14, 1989, the court denied MacDonald's application for appointed counsel, gave him a further opportunity to submit more information, and gave him a November 29, 1990 deadline to file that information. The order cautioned MacDonald that while the court would entertain an order appointing an attorney despite the finding he was not indigent, in that event he would be liable for the time and expenses of appointed counsel at the time of judgment.

MacDonald was arraigned on November 29, 1989 and he did not provide any supplemental information or make any further request regarding the appointment of counsel.

On December 14,1989, the Navajo Nation moved for separate trials on the three complaints and to vacate the trial set for January 29, 1990. The ground for the motion to vacate was the fact that MacDonald had not notified the court of his election to proceed represented by counsel or to proceed *pro se* in his own defense. The Navajo Nation pointed out (correctly) that the court was "virtually paralyzed" until this question was resolved.

On December 19, 1989, the Navajo Nation filed a motion for leave to amend the criminal complaint. On January 11, 1990, MacDonald secured the services of the law firm of Roberts & Jolley of Farmington, New Mexico by means of a written legal services agreement. That agreement and its legal effect are a very important part of this decision, as it will be discussed in greater detail below. In essence, it attempted to limit representation to a trial to take place on January 29, 1990, and MacDonald agreed to pay a fee of $25,000.00 for a trial of five days or less and an additional $1,600.00 per day if the trial went beyond five days.

On January 12, 1990, F.D. Moeller and the Roberts & Jolley firm entered their

appearances on behalf of MacDonald. Moeller was in the picture because he is a member of the Navajo Nation Bar Association and Roberts and Jolley are not. It was a *pro hac vice* appearance, or one by which individuals who are not members of a local bar seek the leave of court to appear despite their lack of membership. The normal practice nationwide is for a member of the local bar to sponsor the nonmember attorneys, advising them of local law and certifying that their conduct of the case is in compliance with local law.

At the same time, petitioners stated that they had no objection to the filing of an amended complaint so long as the trial court proceeded as scheduled on January 29, 1990. That was approximately 17 days in the future, and there had been no discovery and no pretrial motions. The defense counsel made a claim for a speedy trial, also objecting to separate trials on each of the three criminal complaints. They also filed a motion for discovery.

On January 16, 1990, the Navajo Nation moved to consolidate the "Bribes and Kickbacks Case" with similar charges against MacDonald's son, Peter MacDonald Jr., and it moved to clarify the status of defense counsel. The prosecution pointed out the limited appearance of the petitioners and asserted that if the January 29, 1990 trial was postponed, their appearances would terminate. On January 20, 1990, the defense reasserted a demand for a jury trial on January 29, 1990 saying that the cases were neither complex nor difficult, and (based upon their inspection of documents) MacDonald was ready to proceed to trial.

On January 25, 1990, the trial court granted a continuance of the trial on the basis of MacDonald's lack of representation from November 29, 1989 through January 12, 1990 and a resulting lack of readiness for trial. At the same time, the court ruled that it was not bound by the agreement between MacDonald and his attorneys. The reasons for the ruling were that the Navajo Rules of Criminal Procedure and fairness in the criminal process overcame the provisions of the agreement. It also found that there was no prejudice to MacDonald in granting a continuance, given MacDonald's participation in the delay by not securing counsel earlier, and a failure to show any prejudice resulting from a new trial date.

The court held a hearing on January 31, 1990 to consider the motion to file an amended complaint, a motion for separate trials on the three complaints, the motion for discovery, and the question of the effect of a limited entry of appearance. The court made oral rulings on these matters and entered a formal order upon them on February 12, 1990. The order stated that the appearance restrictions were unethical and "totally unacceptable" as a violation of Rule 31 of the Navajo Rules of Criminal Procedure. There was no appeal or request for extraordinary relief as a result of the order. Instead the cases progressed.

On February 23, 1990, attorney William J. Cooley entered his appearance on behalf of MacDonald, also associating himself with Moeller. Disputes erupted over that limited entry of appearance and a purported conflict of interest of Roberts & Jolley in representing MacDonald. On March 3, 1990, Moeller and Cooley entered their general appearance on MacDonald's behalf.

The court held a pretrial conference on March 23, 1990 and this time MacDonald asked for a continuance on the ground he needed further time to prepare for trial because of an amendment to the complaint in the Election Code Case. It was granted.

On May 9, 1990, Moeller, Roberts, Jolley, and Cooley asked the court to permit them to withdraw on the grounds that their limited entry of appearance had been rejected and the January 29, 1990 trial had not taken place as scheduled. The motion was discussed during a pretrial conference, and following the court's oral ruling, it was denied. Petitioners failed to reappear for the afternoon session of that conference. The court formally denied the motion on May 11, 1990.

On May 14, 1990, Moeller filed a motion for withdrawal claiming that he only entered an appearance as a matter of accommodation of Roberts & Jolley. On May 17, 1990, Roberts and Jolley filed a motion for reconsideration of their May 9, 1990 motion to withdraw. It was denied on May 24, 1990 following a hearing.

On May 21, 1990, Roberts and Jolley filed another motion to withdraw, this time stating their good cause to be Roberts' wife's surgery and Jolley's back injury. On May 23, 1990, with a jury panel assembled for selection, the court asked the parties if they were ready to proceed. Defense counsel made a motion for continuance based upon the grounds of the motion to withdraw (i.e. the surgery and back injury). The court rescheduled the Election Code Case to June 9, 1990 based upon that motion.

On May 31, 1990, Roberts and Jolley made another motion to withdraw, again raising Roberts' wife's surgery and Jolley's back injury. On June 9, 1990, when the Election Code Case was ready for trial, Roberts and Jolley reiterated the facts underlying their motion to withdraw and the court permitted them to withdraw from the Election Code Case only. The court instructed MacDonald to apply for court-appointed counsel for that case and rescheduled trial for July 24, 1990.

There were various proceedings regarding appointed counsel, including petitions for relief to this Court. On July 24, 1990, this Court ordered the district court to consider MacDonald's application for court-appointed counsel and to appoint counsel to serve *pro bono publico* if MacDonald was found to be indigent. In the event he was found not to be indigent, this Court ordered the district court to appoint counsel to be compensated by the Navajo Nation. The Navajo Nation was to be granted the right to recover from MacDonald. The district court appointed Peter Breen and Moeller to represent MacDonald, and after hearing testimony that MacDonald had a deferred compensation fund up to $40,000.00, a monthly income over $4,500.00, and he was raising about $1,000.00 per month for legal expense through fund-raising, the district court provided that the Navajo Nation could recover any amounts advanced from MacDonald.

On August 1, 1990, the court held a telephone conference with the parties, and their counsel agreed that the Bribes and Kickbacks Case would proceed first, with Moeller, Roberts, and Jolley representing MacDonald. It was tentatively set for September 18, 1990. In the meantime, Moeller, Roberts, Jolley and Cooley

filed a motion to withdraw which is the subject of this ruling. They asked for leave to withdraw or alternatively for compensation, as previously provided. The motion stated that MacDonald had not paid his counsel since an initial payment, and that to require them to continue for the defense without compensation would deny them due process, cause a taking of property without just compensation, impair their contract with the defendant, and (given the order of compensation in the Election Code Case), deny them equal protection of the law. The court held a hearing on the motion on September 12, 1990 and, on that same day, it entered a written order denying the motion to withdraw and taking the motion for compensation under consideration.

The district court has now supplemented its September 12, 1990 order with detailed findings of fact and three conclusions of law:

1. Movants Moeller, Jolley, Roberts and Cooley have not made an adequate showing that they are in compliance with Rule 31 of the Navajo Rules of Criminal Procedure in that they neither showed good cause for their withdrawal nor made an entry of substitute counsel.
2. This Court has neither interfered with Movants' contractual relationship with their client nor compelled Movants to continue representation in this case.
3. Movants' rights to due process of law and equal protection under the 1968 Indian Civil Rights Act have not been violated by denying them leave to withdraw when they have not complied with Rule 31 of the Navajo Rules of Criminal Procedure.

This is the case before the Navajo Nation Supreme Court. The issues which ultimately arise from the record and these findings are as follows:

1. Did the district court make an error of law and abuse the discretion granted by 7 N.T.C. § 606 or Rule 31 of the Navajo Rules of Criminal Procedure?
2. Did the petitioners make a showing of the denial of any right conferred by the Navajo Bill of Rights or the Indian Civil Rights Act of 1968?

## ENTITLEMENT TO THE REMEDY

The Supreme Court of the Navajo Nation has original jurisdiction to entertain petitions for a writ of prohibition pursuant to the extraordinary writs jurisdiction statute at 7 N.T.C. § 303. The Supreme Court has implemented that statute in Rule 26(a) of the Navajo Rules of Civil Appellate Procedure (1987).

A Writ of Prohibition is a discretionary writ and is appropriately issued where the trial court is proceeding without or in excess of its jurisdiction, or has abused its discretion in exercising its function over matters within its authority to decide and Petitioner has no plain, speedy, and adequate remedy at law.

*McCabe v. Walters*, 5 Nav. R. 43, 47 (1985) (citations omitted).

> A writ of prohibition is an extraordinary remedy which we will grant only in rare cases showing absolute necessity. At a minimum we prefer that the application show that (1) the lower court is about to exercise judicial power; (2) the exercise of such power by the lower court is not authorized by law; and (3) the exercise of such power will result in injury, loss or damage for which there is no plain, speedy and adequate remedy at law.

*Yellowhorse v. Window Rock Dist. Ct.*, 5 Nav. R. 85, 87 (1986).

Prohibition is the correct remedy for the situation before the Court. The petitioners applied for leave of the trial court to withdraw as counsel for the defendant, citing grounds for doing so and offering an affidavit and exhibits in support of the motion. The trial court held a hearing on the motion to elicit the arguments of counsel.

In *Agraan v. Superior Court*, an Arizona Court of Appeals decision, the defense attorney made several motions to withdraw as counsel after his client became indigent. The attorney also sought appointment as counsel in order to be paid at state expense. 4 Ariz. App. 141, 418 P.2d 161, 162 (Ariz. App. 1966). The appellate court found, given the assistance of counsel is an "essential jurisdictional prerequisite to a valid conviction, ... that prohibition is an appropriate remedy to test a party's right to assignment of counsel." *Id.* The test applied was that "[p]rohibition lies when the court exceeds its jurisdiction by abusing its discretion." *Id.* at 163.

New Mexico has entertained a similar issue, abuse of discretion in refusing to change appointed attorneys using the test that "the trial court has discretion in ruling on such matters and we will not interfere except where there is an abuse of discretion." *State v. Tovar*, 98 N.M. 655, 651 P.2d 1299, 1302 (1982).

The general rule is that the grant of leave to withdraw by the court is discretionary, and "ordinarily the trial court's decision will be reversed only when plain error is committed." Hall, *Professional Responsibility of the Criminal Lawyer*, § 5.26 (1987). Also,

> Ordinarily the question of whether an attorney should be permitted to withdraw his appearance is within the discretion of the trial court and the decision of the trial court will be reversed only when plain error is committed.

*Phoenix Mutual Life Insurance Co. v. Radcliffe on the Deleware, Inc.*, 266 A.2d 698, 700 (Penn. 1970) (quoting authorities).

"Plain error" is a rule of appellate review, and its meaning is as follows:

> Doctrine of "plain error" encompasses those errors which are obvious, which affect the substantial rights of the accused, and which, if uncorrected would be an affront to the integrity and reputation of judicial proceedings. The principle that an appeals court can reverse a judgment because of an error in the proceedings even if the error was not objected to at the time. "Plain error" doctrine applies where evidence is extremely damaging, the need for limiting instruction is obvious, and failure to give it is so prejudicial that it affects defendant's substantial rights.

*Black's Law Dictionary*, 1035 (5th ed. 1979) (citations and misprint repeat of first sentence omitted).

The resulting issue which must be resolved before issuing a writ here is whether there was such an abuse of discretion by the trial court that there was plain error sufficient to move the discretion of this Court.

## STANDARD FOR THE WITHDRAWAL OF COUNSEL IN A CRIMINAL CASE

The standards by which we measure the trial court's discretion here are contained in a Navajo Nation statute, and the Navajo Rules of Criminal Procedure, which are supported and augmented by general American authority. 7 N.T.C. § 606 provides:

> Every defendant in a criminal case shall have the right to have representation by legal counsel and in the event he has no such representation, he may proceed without legal counsel or a legal counsel may be appointed by the judge.

This statute establishes rights for the criminal defendant as well as the authority of the district court to appoint counsel. Rule 31 of the Navajo Rules of Criminal Procedure provides:

> Whenever counsel has once appeared either in open court or by motion to represent a defendant, such counsel shall be responsible to the Court for his actions and shall not be allowed to withdraw from the case except by order of the Court upon written motion naming new counsel and stating good cause.

This has been the firm rule of our courts since at least the third edition of the *Navaio Court Rules*, published in 1978. It does not permit practitioners to do anything more than generally "appear," either in person or by pleading, and an attorney cannot withdraw from the representation of a party in our courts without showing good cause and having new counsel named. On any appearance by any attorney in our courts (including those permitted to appear *pro hac vice*), the attorney is "responsible to the Court for his actions."

Navajo law is a restatement of general American court procedure. The general rule is as follows:

> An attorney may not, in the absence of his client's consent, withdraw from the case without justifiable cause, and then only after proper notice to the client and on leave of court. An attorney seeking to withdraw must apply to the court, as the relation does not terminate formally until there is withdrawal of record. Otherwise, the relation continues until the end of the litigation.

*Orfield's Criminal Procedure under the Federal Rules*, § 44:8 (1987) (Discussing application of the Federal Rules of Criminal Procedure). Also,

> An attorney who undertakes to conduct an action impliedly stipulates that he will prosecute it to a conclusion, and he is not at liberty to abandon the suit

without reasonable cause. If reasonable cause exists, however, an attorney, prior to termination of the case, and on reasonable notice, may end the attorney-client relationship. So far as the client is concerned, an attorney need not obtain leave of court before withdrawing his appearance in a case. However, court rules commonly provide that permission for withdrawal from employment must be obtained, and in such case, an attorney may not withdraw from employment without permission. The granting of leave to withdraw by the court is generally in the discretion of the court and depends upon such considerations as the closeness of the trial date and possibility for the client to obtain other representation. Under some circumstances it is required that counsel seeking to withdraw shall furnish the court with a pleading in support of the request. Ordinarily the trial court's decision will be reversed only when plain error is committed.

\*\*\*

What constitutes a sufficient cause to justify a retained attorney in abandoning a case depends largely on the particular circumstances. Sufficient cause may exist if the client fails to advance expenses, or to recognize any liability for attorney's fees, or to make payments on account of fees during the progress of protracted litigation.

\*\*\*

The mere fact that an attorney might have made a bad bargain with his client does not justify the attorney in asking for additional compensation and in withdrawing from the case upon the refusal of the client to agree to such a request.

Hall, *Professional Responsibility of the Criminal Lawyer*, § 5.26 (1987).

Some of the cases dealing with the withdrawal of counsel give more meaning to the application of these rules. The general rule has existed for a very long period of time, with Chief Justice Taney stating it in an 1848 Supreme Court decision: "No attorney or solicitor can withdraw his name, after he has once entered it on the record, without the leave of court." *United States v. Curry*, 6 How. 106, 111 (1848). That same rule was applied for this federal appellate circuit in *Lovvorn v. Johnston*, 118 F.2d 704 (9th Cir. 1941). There a petitioner for a writ of habeas corpus alleged that before the verdict was returned on charges of conspiracy and passing counterfeit money, his attorney withdrew from the case without his knowledge or consent. He said that because of that he lost his right to appeal and he did not know he had a right to have appointed counsel. *Id.* at 705-706. In considering these claims the court held that an attorney cannot withdraw from a case without the consent of the court and then only for justifiable cause, after proper notice to the client. *Id.* at 706.

In *Johnson v. Norton*, the defendant's retained counsel perfected an appeal from a conviction, then withdrew. The trial court did not inform him of the right of appeal and if indigent, of the right to court-appointed counsel, as required by

Rule 32(a) (2), Fed. R. Crim. P. Given that and the rule, counsel should have not been permitted to withdraw until new counsel had appeared or been appointed or the defendant affirmatively waived counsel. The court granted post conviction relief and restored a previously dismissed appeal to the calendar. 435 F.2d 842, 843 (1st Cir. 1970).

The nice distinction about general and "special appearances" arose in *Mandell v. Superior Court for Los Angeles County*, 67 Cal. App.3d 18, 136 Cal. 354 (1977). There an attorney received his fee for representing a criminal defendant only through a preliminary hearing. After that hearing the defendant was held to answer, and ordered to appear for arraignment. The defendant was there, but his attorney was not. The court put over the arraignment and summoned the attorney to another held the next day. When asked why the attorney was not present for the arraignment, he said that he had been retained for only the preliminary hearing. He then asked to withdraw. The trial court stated that "if counsel had made a 'general appearance' at the preliminary, he would not be relieved." The attorney could not remember if he stated during the preliminary that his appearance was for that hearing only. After later argument, and upon the inability of the attorney to find any written proof he had used the words "special appearance" during the preliminary hearing, the trial court ruled that since he failed to announce a limited appearance, "he was 'on the hook, so to speak.'" *Id.* at 355. On a petition for a writ of mandate the court ruled that a court has discretion to deny an attorney's request to withdraw "where such withdrawal would work an injustice or cause undue delay in the proceeding." The discretion must be exercised reasonably. *Id.* Here the question of injustice or delay was not in the record, and the court of appeals honored the limited representation agreement, saying that court's discretion in the area "does not justify the doctrine of 'on the hook' applied in this case." *Id.* at 356.

The case of *United States v. Gipson*, is very close to the situation here. 517 F. Supp. 230 (W.D. Mich. 1981). Gipson had retained counsel, and during proceedings that attorney made a motion for court-appointed counsel. Looking at the Criminal Justice Act of 1964, the court applied the rule that it only need "be satisfied that the representation essential to an adequate defense is beyond the means of the defendant." *Id.* at 231. The court found that Gipson had $42,850.00 in assets and his wife's monthly income of $600.00. He had debts of $27,785.00 and monthly bills of $430.40. He had already spent approximately $2,500.00 for fees. The court found that he was not entitled to appointed counsel because it could not find he could not afford counsel of his own choosing.

> Moreover, even if the Defendant in the case sub judice were unable to afford counsel at this juncture, his present attorney of record, is under a continuing duty to represent him in a punctilious and zealous manner. Lawyers, as guardians of the law, play a vital role in the preservation of our society. As such, it is not only the right but the duty of the legal profession as a whole to utilize such methods as may be developed to bring the services of its mem-

bers to those who need them, so long as this can be done ethically and with dignity.

*Id.* The court denied the motion, requesting the retained counsel to continue with the defense.

Another similar situation is that found in *United States v. Rodriquez-Baquero*, 660 F. Supp. 259 (D. Me. 1987). Rodriguez-Baquero had retained defense counsel to represent him. The agreement was that the defendant would pay a retainer of $10,000.00, but he had only paid $3,800.00 as of the time of the motion to withdraw. The local court rule required leave of court to withdraw. *Id.* at 259-260. At a hearing on the motion the attorney recited the fact of nonpayment and the expenditure of the $3,800.00 for expenses. The court required the filing of an affidavit showing those expenses, which the attorney did not file until 22 days prior to the commencement of trial. *Id.* at 260. The court found as follows:

> Only a single reason is advanced to permit Mr. Orta to withdraw: that, as privately retained counsel, Mr. Orta made a bad deal in accepting employment by and appearing for the Defendant and wishes now to be relieved of the consequences of that transaction. Such withdrawal, however, could occur only to the prejudice of the Defendant's substantial rights and the interests of the speedy administration of justice and judicial economy.

*Id.* at 261. After considering all competing interests and finding that on balance the interest in relieving the attorney of the consequences of his own private contractual arrangement did not outweigh the substantial interests of the defendant, the court, and the administration of justice, the motion was denied. *Id.*

The final decision we use is that in *Commonwealth v. Zaiser*, 549 A.2d 1320 (Penn. 1988). There the attorney contested an order denying his petition to withdraw as defense counsel in two cases — delivery of cocaine and another for possession with intent to deliver cocaine, possession of cocaine, and possession of marijuana. The fee arrangement was that the attorney could withdraw from representation if the defendant failed to make payment when due. The attorney stayed with the defendant following trial, conviction, and the filing of an appeal. The trial court accepted the contention that the defendant owed a total of $12,518.58. The rule applied on appeal was that,

> There are no prophylactic rules which exist when determining whether a denial of withdrawal amounts to an abuse of discretion. Each case must be decided by balancing the competing interests giving due regard to the facts presented.

*Id.* at 1321 (cite omitted). In this particular case the court found that there was no prejudice which might occur to the client. *Id.* at 1322. The attorney represented the client "in a competent and conscientious manner," and he took on many duties without compensation. He waited to bring his motion to withdraw until the appeal had been filed and "acted to minimize the inconvenience to the client due

to this withdrawal." The order was vacated and the case remanded for the appointment of counsel. *Id.* at 1323.

We now apply these rules to this particular case. To do so we must go back to January 11, 1990, the date on which Peter MacDonald Sr. entered into a "legal services agreement" with the law firm of Roberts & Jolley. MacDonald had made his initial appearance before the court on November 17, 1989, at which he had claimed indigence, and the court denied the application for appointed counsel on November 24, 1989. Roberts and Jolley knew or should have known that the court had found that MacDonald possessed assets of an aggregate value of more than $200,000.00 and had a salary of $55,000.00 per year.

The fee arrangement in the January 11, 1990 agreement was that MacDonald would pay $25,000.00 for representation at trial, plus a gross receipts tax of $1,375.00 (despite the fact services were rendered within the Navajo Nation). The exhibit submitted at the hearing on the motion (Ex. 3) shows a balance due and owing by defendant to Roberts & Jolley of $64,871.82. There is no record of how much the defendant has paid his attorneys, but the petitioners' memorandum in the trial court asserts that $21,129.60 has been previously paid.

The original $25,000.00 agreement was that this would pay for trial preparation and a trial of five days or less. Of that $20,000.00 would go for pretrial matters and $5,000.00 would be the price of a five-day trial. The agreement provides that MacDonald would pay an additional $1,600.00 per day for each day of trial beyond the initial five-day trial. The agreement specifically provides that if the trial set for January 29, 1990 was continued, then the $5,000.00 would go toward an appeal on "a speedy trial issue." It went on to provide that if the original trial was continued and reset, the parties would negotiate a further fee agreement. There was an express agreement that if the January 29, 1990 trial was continued, the attorneys could withdraw from representation. The arrangement was that MacDonald would pay $5,000.00 before the attorneys entered their appearance (with no mention of any "special" appearance) and the balance of $21,275.00 would be paid by January 26, 1990. The petitioners say MacDonald actually paid $21,129.60.

There is a problem raised with these dates and figures that is not explained in the record. Such is the responsibility of the petitioners, and if it is to their disadvantage, it is their fault.

We have before the Court a legal services agreement which provides for a flat fee — $20,000.00 for pretrial preparation and $5,000.00 for a five-day trial. There is an extension of a form of credit in the agreement today of $1,600.00 per day for each day of trial beyond five days. We have before us a statement for legal services of $64,871.82. On January 20, 1990, Moeller, Roberts, and Jolley filed a pleading asserting a speedy trial demand to proceed on January 29, 1990.

> They alleged that the cases were neither complex nor difficult and that, based on a three day inspection of documents, MacDonald was ready to proceed to trial on January 29, 1990.

Trial Court Findings of Fact, Par. 12, p. 6.

The conundrum before this Court is that counsel entered into a flat fee legal services agreement for the trial of a case when the petitioners knew (or should have known through adequate inspection of court records before entering into the agreement) that on December 14, 1989 the Navajo Nation had moved to vacate the January 29, 1990 trial date because MacDonald had not elected either to proceed with counsel or represent himself. On December 19, 1989, the Navajo Nation filed its motion for leave to file an amended criminal complaint, containing the additional charges subject to the September 6, 1989 fee statement which came into evidence before the district court. It appears that MacDonald has substantially given the petitioners the benefit of their bargain, i.e. $21,129.60 when the agreement calls for a payment of $20,000.00 for pretrial legal services.

The Court cannot understand why there is any great prejudice or burden to the petitioners when their actual bargain was for $25,000.00 for pretrial proceedings and a five-day trial. Since there is no explanation of this point and the burden for satisfying this question is on the petitioners, the district court was correct in finding that there was no showing of good cause. These is no prejudice on the benefit of the bargain approach to the situation.

It is true that the law firm will incur expenses if the trial of this matter is lengthy; however, the petitioners must have considered that before entering into the agreement. The agreement is open-ended about the $1,600.00 per day continuing representation fee deal, and Roberts and Jolley must have been satisfied that the defendant had the means to pay this and would in fact pay it. The record does not show a flat refusal or an inability to pay the fee bargained for.

There was something else before the petitioners Roberts and Jolley as of January 11, 1990 when they entered into their agreement with MacDonald — the law of the Navajo Nation. It is hornbook law that the activities of people performing contracts are governed by the law of the place where they will be performed. While it is true that the agreement may have been executed at Farmington, New Mexico, outside the outer boundaries of the Navajo Nation, it clearly was to be performed within the Navajo Nation. The statute and rule of court cited at the beginning of this section were discoverable, and as counsel about to enter a jurisdiction to practice law, they should have known it.

However, as we have seen, 7 N.T.C. § 606 and Rule 31 of the Navajo Rules of Criminal Procedure are not alien to the non-Indian practitioner of American law. They are rules one should learn in first-year criminal law, a criminal procedure course, a professional responsibility seminar, or a legal clinic. They are fundamental rules of practice. The petitioners state (at page 10 of their brief-in-chief) that "Mr. Jolley and Mr. Roberts have been involved in criminal law, both as prosecutors and defense counsel for 15 years." They knew or should have known of Rule 31 because it is a common rule. It is the rule in New Mexico, where they practice. In *State v. Tovar*, the New Mexico State Supreme Court dealt with the denial of a trial court motion to change attorneys before trial. The

court held that "the trial court has discretion in ruling on such matters and we will not interfere except where there is an abuse of discretion." 98 N.M. 655, 651 P.2d 1299, 1302 (1982). In *State v. Maes*, that same court dealt at length with a motion to withdraw on an ethical question (also ruling that, "A defendant cannot use his right to counsel as a means of delaying court proceedings"). 100 N.M. 78, 665 P.2d 1169, 1173 (1983). In *State v. Martinez*, another motion to withdraw on ethical considerations, the New Mexico Supreme Court held that a defendant must show good cause to change counsel. 100 N.M. 532, 673 P.2d 509, 513 (1983).

The rule in Arizona is the same. *Agraan v. Superior Court of Pima County*, 4 Ariz. App. 141, 418 P.2d 161, 162 (1966); *Rodriquez v. State*, 129 Ariz. 67, 628 P.2d 950, 953 (Ariz. 1981); *State v. Cruz*, 137 Ariz. 541, 479 (1983).

The fee arrangement is unusual because it is an agreement which obviously flies in the face of normal American court practice. It is an obvious attempt to bind the prosecution and the court through an agreement limiting representation to a trial to take place on January 29, 1990, after the Navajo Nation had moved to vacate that trial date, and after the Navajo Nation had moved to amend the complaint to raise the additional charges the petitioners are handling now. The petitioners were in a position to know the extent and nature of the charges before entering into the agreement, and if they did not assess the case before signing it, that belies an asserted 15 years of criminal law practice. There is no explanation why the petitioners Roberts and Jolley were prejudiced by the payment of about $21,000.00 when their agreement provided for a $20,000.00 fee for pretrial proceedings. There is no explanation of the $65,000.00 bill in the face of the agreement.

There is also no showing of precisely how or why *all* the petitioners are prejudiced or damaged by the district court's action. Petitioners Roberts and Jolley entered into an agreement which may not have been violated, and there is nothing in the record to show that in fact they will not be paid. As the Court cautioned when remanding this matter for findings of the district court, it is their responsibility to prepare the record in support of their petition. The record does not show actual prejudice, and in fact raises many questions about the true relation of the contract to their services. Given the knowledge they had at hand at the time they drafted the agreement, it appears that there may have been an initial plan for counsel-induced error and a present one of moving the trial date back on the basis of multiple motions to withdraw. This Court will not relieve any defendant because of counsel-induced error.

As for Moeller and Cooley, there is nothing in the record to show good cause in support of their motion or prejudice to them. Even if counsel are required to assume their responsibilities as American lawyers to carry on with a case once they have entered their appearance in it, there is nothing before the Court to show that there could not be a fair allocation of burdens among the four petitioners. The petition does not address this point. Moeller may not be a criminal law practitioner, but he has practiced before the Navajo courts for many years. In many

jurisdictions all lawyers, regardless of speciality, are appointed to defend criminal matters. This is the general situation in federal courts and in the District of Columbia. *See, United States v. Thompson*, for Chief Judge Bazelon's (District of Columbia Circuit) discussion of the problems of such arrangements. 361 F. Supp. 879 (D.D.C. 1973). Mr. Cooley's grievances do not appear in the record at all.

Returning to *United States v. Rodriquez-Baquero*, for a moment, it is clear that there is a balancing of interests in the consideration of criminal defense counsel's motions to withdraw. We must consider (1) The attorneys rights; (2) The defendant's substantial rights; (3) The public's interest in the speedy administration of justice; and (4) The court's right to judicial economy. We also consider whether the public must pay for criminal defense. 660 F. Supp. at 261.

### 1. *The Attorney's Rights*

Certainly these attorneys have rights. They have the right to have their fee arrangement honored and the right to ask permission to withdraw if they are not paid. They have the right to not have to pay expenses out of their own pockets. These rights are balanced against those of the defendant, the people, and the courts, but they are weighty rights. The district court and this Court are not satisfied that there has been a showing of prejudice.

### 2. *The Defendant's Rights*

The defendant, Peter MacDonald Sr., has quite wisely stated that he does not wish the release of his attorneys and he wants counsel. There is a question of whether attorney compensation may be handled in some alternative fashion, but the fact remains that trials are scheduled and MacDonald has the right to enter them with competent counsel. His refusal to release these attorneys and provide for the appearances of other counsel is a strong fact that this Court must consider in ruling that the district court correctly exercised its discretion in refusing to release these petitioners from MacDonald's service.

### 3. *The Navajo People's Rights*

No matter what the outcome of these charges, we have the fact that a Navajo leader and candidate for public office is on trial. Aside from the individual's right to a speedy trial, the public has a right to one as well. Here the Navajo People have the right to the swift and certain administration of justice to remove the cloud which hangs over the Navajo Nation. The district court acted properly in insisting that the public right to the administration of justice will not be compromised for the convenience of these petitioners.

### 4. *The Court's Rights*

The Courts of the Navajo Nation have a particular problem in appointing criminal defense counsel. While not required to do so by the Indian Civil Rights Act, there has been a long-standing practice of appointing counsel for indigents. The members of the Navajo Nation Bar Association carry out their obligations to serve without compensation well, and they must be praised for it.

At the same time, as the petitioners remind us, this is not a case where the court appoints counsel to represent an indigent as an obligation of bar member-

ship. Indeed it is not. This is a case where attorneys who claim many years of experience in criminal law have voluntarily induced themselves into this case and now wish leave to withdraw because they made an imprudent arrangement. It appears imprudent on its face, but an analysis of the agreement and the fees paid leads to a conclusion that they may be getting what they bargained for. At least, they have what they should have known they were bargaining for under the American criminal defense bar rules.

The Navajo Nation courts have limited resources and they are straining them in the appointment of counsel without compensation. There is a serious question of what the Navajo Nation courts will do if these petitioners are allowed to step away from their obligations to the defendant and new counsel must be appointed. If the courts cannot find the monetary or personal resources to provide defense counsel, there may be no choice but to dismiss the charges against this defendant. That would bring the courts of the Navajo Nation into disrepute.

Therefore the courts have the right to consider their right to judicial economy, including assuring a speedy trial, a fair trial, and a trial which determines the facts and law on the merits.

## THE CONSTITUTIONAL CLAIMS

The normal canon of appellate procedure is that if a case may be decided on the law, the appellate court will not reach constitutional issues. We do so here because they are important and because the petitioners have pressed their point with great insistence.

The petitioners claim violations of a general right of due process, the taking of their "property" without just compensation as an element of due process, the impairment of the contract as an element of due process, and a denial of equal protection in that arrangements have been made for the compensation of some counsel, while such arrangements have not been made for them.

These contentions may be resolved on very simple grounds. In 1932, the United States Supreme Court ruled, in a capital case where the Court decided the Constitution required providing counsel, that,

> Attorneys are officers of the court, and are bound to render service when required by such an appointment.

*Powell v. State of Alabama*, 287 U.S. 45, 73 (1932). While the Navajo Nation Supreme Court is not directly bound by federal precedent, when questions of federal law, and particularly questions under the Indian Civil Rights Act of 1968, arise, we look to the precedents of the United States Supreme Court and the Ninth Circuit Court of Appeals for guidance. (We also of course look to decisions of other jurisdictions for guidance). The issue of the constitutional rights of the petitioners under the Indian Civil Rights Act is resolved by the 1965 decision in *United States v. Dillon*, 346 F.2d 633 (9th Cir. 1965). There the Court held that

there was no "taking" of an attorney's services because of the general obligation of attorneys to serve at the direction of the courts. *Id.* at 635. The same considerations require us to deny the other due process claims.

The prohibition against the impairment of contracts is that only legislative action that does so is prohibited. Judicial retroactivity affecting contracts is not banned.

> In order to come within the provision of the Constitution of the United States, which declares that no state shall pass any law impairing the obligation of contacts, not only must the obligation of a contract be impaired, but it must have been impaired by some act of the legislative power of the state and not by a decision of the judicial department only.

*Central Land Co. v. Laidley*, 159 U.S. 103 (1895). Even if this was a prohibition against judicial action, the right to assure justice is one of the greatest activities of the sovereign in exercising its police power, and police power modifications of contracts are permissible. *Northwestern Fertilizer Co. v. Hyde Park*, 97 U.S. 659 (1878); *Stone v. Mississippi*, 101 U.S. 814 (1880); *Atlantic Coast Line R. Co. v. Goldsboro*, 232 U.S. 548 (1914); *Home Bldg. & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 437 (1934).

It is only valid private contracts which are safeguarded, assuming there is a right here. *Taylor v. Thomas*, 22 Wall. 479 (1875). Here there was a contract which, if not in violation of Navajo law, was subject to its terms. The contract was to be performed within the Navajo Nation and subject to its legal authority. There was a long-standing rule of court which the petitioners know of or should have known of. It appears that only Roberts and Jolley may assert the contract right, and we do not know what "contract" of Moeller or Cooley was impaired (if any was).

The equal protection claim is not before the Court. As indicated previously, there was a motion by counsel for leave to withdraw or alternatively for compensation. This Court holds that the district court did not abuse it discretion or create plain error in its ruling. Because the district court has not acted, as shown above in the section dealing with the remedy of prohibition, this Court has no jurisdiction with respect to the remainder of the petition.

For these reasons the petition for writ of prohibition is denied.